**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Chief Judge Marcia S. Krieger**

Civil Action No. 15-cv-00667-MSK-MJW

**BRADLEY REED WARREN,**

    Petitioner,

v.

**EMILY REBECCA RYAN,**

    Respondent.

---

**OPINION AND ORDER DIRECTING RETURN OF CHILDREN**

---

**THIS MATTER** comes before the Court on a Petition (**#1**) brought pursuant to the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, *et seq.*, which implements the Convention on the Civil Aspects of International Child Abduction, done at the Hague on 25 Oct 1980 ("Convention"). The Petitioner seeks an order returning the parties' children to their place of habitual residence in Australia for determination of custody between himself and the Respondent. An evidentiary hearing on the Petition was held on June 3, 2015. Based on the evidence presented and the arguments made, the Court finds and concludes as follows.

**JURISDICTION**

The court exercises jurisdiction pursuant to 28 U.S.C. § 1331.

## MATERIAL FACTS

The Court summarizes the material facts below, but addresses specific evidence in the context of its analysis.

The Petitioner, Mr. Warren, and the Respondent, Ms. Ryan, are Australian citizens. They are parents to two minor children who are also Australian citizens: a five-year-old girl, "A", and a three-year-old boy, "L." Mr. Warren is a Lieutenant Colonel in the Australian Army. Ms. Ryan is lawyer licensed to practice in Australia and California.

In August 2014, Mr. Warren, Ms. Ryan, and the children traveled from Australia to California so that Ms. Ryan could attend two legal conferences and for a family vacation. At the time, Ms. Warren was unemployed but she hoped to find employment in the United States. The family was accompanied by an *au pair* who was to supervise the children, but for some time during August and September, Ms. Ryan entrusted the children to Mr. Warren's sole care while she traveled independently. Mr. Warren returned to Australia on September 11, 2014, expecting that Ms. Ryan and the children would return sometime later.

In the ensuing months, the couple was in frequent communication, with Ms. Ryan repeatedly advising Mr. Warren that she was delaying her return (and, thus, the return of the children) for various reasons. Ms. Ryan considered taking a short term job in the U.S., but Mr. Warren expected Ms. Ryan to return Australia in order for their daughter to start school in February 2015. In December 2014, Mr. Warren learned that Ms. Ryan had become involved with another man in the United States. He demanded that she return the children immediately. When she did not, he filed a Hague Convention Application with the appropriate authorities and, ultimately, filed the Petition that initiated this action.

Ms. Ryan and the children did not return to Australia. They are presently residing in with Ms. Ryan in Colorado. Ms. Ryan has initiated a dissolution of marriage action in the Colorado state courts. Mr. Warren has initiated an action in the Australian Capital Territory in compliance with the Family Law Act of Australia of 1975. This Act, as well as the Domestic Violence and Protection Orders Act of 2008, provide a multitude of remedies and protections for victims of domestic abuse. In addition, the Australian Capital Territory offers robust and widespread Domestic Violence Crisis Services.

## ANALYSIS

### LEGAL FRAMEWORK

The Petition is brought pursuant to the Hague Convention, which is implemented in the United States through ICARA. The Convention seeks to deter parents from abducting their children to another country to obtain a more favorable custodial ruling; it is essentially a ban on forum shopping for custody issues. *See Navani v. Shahani*, 496 F.3d 1121, 1124 (10th Cir. 2007). The purpose of a Convention/ICARA determination is to ensure that the children's home country makes the custody determination whenever possible. *See de Silva v. Pitts*, 481 F.3d 1279, 1286 (10th Cir. 2007). It accomplishes this goal by establishing a mechanism by which courts can promptly order the return of children who have been wrongfully removed from, or retained in, a country other than their home country, so that the home country can make determinations of custody and parenting issues. *See Navani*, 496 F.3d at 1124. Thus, the focus of an ICARA action is the determination of what court—one in the United States or one in another country—will resolve custody and related issues.

### A. *Prima facie* case

To make a prima facie showing on an ICARA petition, a petitioner must establish, by a preponderance of the evidence, that "the child has been wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e)(1)(A). This requires proof that: (1) the child was habitually resident in the foreign state at the time of the removal or retention; (2) the removal or retention was in breach of the petitioner's custody rights under the laws of that state; and (3) petitioner was exercising those rights at the time of removal or retention." *See Navani*, 496 F.3d at 1124 (citing *Shealy v. Shealy*, 295 F.3d 1117, 1122 (10th Cir. 2002)). If a petitioner makes this showing, a presumption arises that the children should be returned to the jurisdiction of habitual residence.  A respondent can avoid return of the children by establishing that one of the Convention's stated exceptions applies.  22 U.S.C. § 9003(e)(2).

The parties agree that the habitual residence of the children is Australia, that Mr. Warren was exercising his parental rights at the time of critical events herein, and that Ms. Ryan's retention of the children in Colorado was in breach of his rights.  Accordingly, the Court finds that Mr. Warren has established a *prima facie* case of wrongful removal, and is presumptively entitled to an order directing the return of the children to Australia.

The Court then turns to Ms. Ryan's contention that exceptions under the Convention warrant denial of the request for return of the children.  Ms. Ryan asserts two exceptions: (1) that Mr. Warren consented to the removal or acquiesced in the retention; and (2) that there is a "grave risk" that return of the children would expose them to "physical or psychological harm or otherwise place the child in an intolerable situation."

### B. Consent or Acquiescence

Article 13(a) of the Convention provides that return of the children is not required if the petitioner "had consented to or subsequently acquiesced in the removal or retention." The respondent parent has the burden to prove consent or acquiescence by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

The question of consent or acquiescence turns on the petitioning parent's subjective intent. *See Baxter v. Baxter*, 423 F.3d 363, 371-72 (3d Cir. 2005); *Larbie v. Larbie*, 690 F.3d 295, 308-09 (5th Cir. 2012); *Nicolson v. Pappalardo*, 605 F.3d 100, 107 (1st Cir. 2010). The question of consent focuses on what the petitioning parent understood and agreed to, usually before the children left their habitual residence. The inquiry requires an examination into what the petitioner contemplated, agreed to, the nature and scope of the petitioner's consent, and any conditions or limitations placed on the consent. A parent's consent to his or child's travel does not necessarily constitute consent to retention under the Convention. *See Baxter*, 423 F.3d at 371.

In contrast, acquiescence addresses the petitioning parent's state of mind after the children have traveled from their habitual residence, usually concerning the removing parent's retention. Generally, proof of acquiescence requires a showing of a formal act "such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *See id*.

Ms. Ryan makes no distinction between "consent" and "acquiescence," suggesting that the terms are interchangeable. The well-reasoned decision in *Baxter* points out the differences which are important to these circumstances. *See* 423 F.3d at 371-72. It is clear that Mr. Warren consented to the children traveling to the United States Ms. Ryan as part of the family vacation in August 2014. But there is no evidence that he consented to Ms. Ryan and the children

remaining indefinitely in the United States thereafter.  There was disputed evidence as to whether, at the time they entered into the marriage, the parties anticipated ultimately residing in the United States.  Even if they did so intend, however, their agreement apparently concerned an intention to move at some point in the indefinite future.  Put differently, Ms. Ryan has not come forward with evidence that Mr. Warren understood and agreed that her remaining in the United States with the children in late 2014 was part of the couple's plan to establish permanent residency in the U.S.   To the contrary, it appears that throughout the remainder of 2014, Mr. Warren expected Ms. Ryan to return to Australia with the children.  This is further corroborated by evidence that, although the parties had vacated the property where they were living prior to their vacation in the U.S., Mr. Warren returned to Australia, stayed briefly with Ms. Ryan's parents, then secured military family lodging.  Such conduct is consistent with a belief that Ms. Ryan and the children would be returning to Australia, and inconsistent with the notion that Mr. Warren was consenting to have the children remain in the U.S.

Turning to the question of whether Mr. Warren subsequently acquiesced to Ms. Ryan keeping the children in the United States, the evidence is in conflict.  Mr. Warren testified that he expected Ms. Ryan to come back to Australia at several junctures during the fall of 2014 – to attend a concert, to celebrate their daughter's birthday, and ultimately to enroll their daughter for the school term beginning in February 2015.  He worried and debated with Ms. Ryan about the wisdom of her undertaking a proposed short-term job in America, but ultimately conceded so long as the job would be completed in time for their daughter to return to Australia and start school. In October 2014, he suggested that Ms. Ryan obtain a temporary U.S. visa to facilitate that arrangement, which the Court finds consonant with his belief that Ms. Ryan would complete the three-month job could by February.

6

Ms. Ryan argues that she gave many signs[1] and stated[2] to Mr. Warren that she intended to remain in the U.S. indefinitely, that she intended to end the marriage, and that Mr. Warren's failure to object to her retention of the children until Dec. 15, 2014 constituted acquiescence. While apart, the parties engaged in extensive electronic communication by text and email,[3] but no communications evidence that Mr. Warren understood that Ms. Ryan intended to stay in the United States on a permanent basis. Similarly, no communications reflect his agreement to Ms. Ryan doing so. As to whether Mr. Warren demanded that Ms. Ryan return during the fall of 2014, the evidence is disputed. He says he did; she says he did not.

Perhaps, with hindsight, Mr. Warren might have surmised that Ms. Ryan intended to permanently move to the United States, rather than simply travel around and visit with friends. But there is no formal evidence of that Mr. Warren harbored such an understanding as of late 2014, and Mr. Warren's conduct does not unqualifiedly demonstrate that he had no objection to her doing so (much less retaining the children as well). To the contrary, Mr. Warren's conduct is consistent with his claimed belief that Ms. Ryan might stay in the U.S. for a short period of time, but return to Australia to enroll their daughter in school by February, 2015. When he became aware in December, 2014, that Ms. Ryan was in another relationship, he unequivocally stated that he desired that Ms. Ryan (or, at the very least, the children) return to Australia. The Court

---

[1] For example, Ms. Ryan testified that, upon arriving in the United States for the August 2014 vacation, she purchased large bottles of shampoo and conditioner, car seats for the children, and an electric toothbrush. She also ordered business cards with a U.S. cellphone number. She states that Mr. Warren was aware of these purchases.

[2] For example, Ms. Ryan testified that the parties discussed her ability to get a job in the United States and how she would go about it.

[3] Only a few such communications were presented to the Court, and due to the customary brevity in such form of communication, their meaning is often ambiguous.

therefore finds that Ms. Ryan has failed to carry her burden of establishing Mr. Warren's consent or acquiescence to Ms. Ryan's retention of the children in the United States.

### C. Grave risk of harm

Article 13(b) of the Convention provides that return of the children is not required if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." A "grave risk" exists when "the potential harm to the child [is] severe and the level of risk and danger [is] very high." *West v. Dobrev*, 735 F.3d 921, 931 (10th Cir. 2013). A respondent invoking this exception is required to show the existence of a "grave risk" by clear and convincing evidence – that is, evidence that "creates in the fact finder's mind an abiding conviction that the truth of a factual contention is highly probable." 22 U.S.C. § 9003(e)(2)(A); *Colorado v. New Mexico*, 467 U.S. 301, 316 (1984).

Most courts recognize two distinct types of "grave risk". First, courts will refuse to return a child to "zone of war, famine, or disease – that is, circumstances in which the child is in grave risk even before any questions of custody can be addressed. *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996). Second, courts may find a grave risk of harm where the children will be exposed to "serious abuse or neglect, or extraordinary emotional dependence" if returned to their country of residence, <u>and</u> where the courts of that country "for whatever reason, may be incapable or unwilling to give the child adequate protection."[4] *Id.* Such a showing

---

[4]   There is a disagreement among courts as to whether it is necessary for a respondent claiming grave risk to show that courts and other administrative agencies of the nation of habitual residence are unable or unwilling to protect the children. The Second, Third and Sixth Circuits seem to agree with *Friedrich*, requiring such a showing. *See Baxter v. Baxter*, 423 F.3d 363, 373 (3d Cir. 2005); *Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001). On the other hand, the Seventh and Eleventh Circuits do not require such a showing, suggesting that an inquiry into the theoretical powers of a nation's court and child welfare systems is no substitute

requires that the respondent demonstrate that the petitioner has engaged in "a sustained pattern of physical abuse and/or a propensity for violent abuse." *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014).  Sporadic or isolated incidents of physical discipline directed at the children, or limited incidents of abuse directed at others and witnessed by the children are not sufficient. *Souratgar v. Lee*, 720 F.3d 96, 104 (2d Cir. 2013).

It is important to recognize that the focus of the "grave risk" exception is on the risk of harm <u>to the children</u>.  A showing of the petitioning parent's physical or emotional abuse of the respondent parent is not enough, of itself, to establish a risk of abuse or harm to the children. *Souratgar*, 720 F.3d at103-04.  However, where the violence directed towards the respondent parent is not sporadic or isolated and occurs in the presence of the children, such abuse might establish the "grave risk" exception. *Ermini*, 758 F.3d at 164-65;

Ms. Ryan does not contend that Australia is a zone of war, famine, or disease.  But she does contend that Mr. Warren has engaged in physical abuse of both her and the children, and that returning the children to Australia would thus place them at grave risk of future abuse. Turning first to her allegations regarding Mr. Warren's abuse of the children, she described an event in which Mr. Warren "grabbed [L] and pulled him and he hit the side of a coffee table," causing L to suffer a bruise on his forehead, and another event in which L suffered bruises on his

---

for a finding that, as a matter of <u>fact</u>, the children will be protected from harm if returned to a potentially-abusive environment. *Van de Sande v. Van de Sande*, 431 F.3d 567, 570-71 (7th Cir. 2005); *see also Baran v. Beaty*, 526 F.3d 1340, 1348 (11th Cir. 2008).  The 10th Circuit has acknowledged this Circuit split, but has not indicated which camp (if either) it would join. *West v. Dobrev*, 735 F.3d 921, 931 n.8 (10th Cir. 2013).

Although this Court finds more logic in the *Friedrich* line of reasoning, it need not address this question because, as discussed herein, it finds that Ms. Ryan has not carried her burden of adequately demonstrating Mr. Warren's abusiveness.  Thus, the question of whether Australian courts and governmental agencies could nevertheless protect the children from such abusiveness need not be considered.

legs when he was "grabbed [by Mr. Warren and thrown around into a piece of furniture." She referenced another occasion when Mr. Warren "grabbed" A, leaving "red marks on her wrist," and a situation in which A sustained "a bruise on [her] bottom . . . from being spanked." She described other incidents in which Mr. Warren "slapped' the children, and where they suffered bruising from being "knocked . . . into a granite kitchen countertop," among others. (The quoted text is reflective of the degree of detail with which Ms. Ryan related each of these incidents.) Ms. Ryan states that she personally witnessed most of these events. Most of them occurred at unspecified times in 2014, including some that allegedly occurred during the family vacation in late 2014.

Ms. Ryan concedes that she never contacted the police or child protective agencies to report Mr. Warren's actions, nor did she seek medical attention for the children as a result of any of these instances.[5] She did attempt to corroborate her testimony by offering photographs that, she contended, depicted many of these injuries. Found primarily as Exhibits 42 and 43, the photographs are undated and are often of fairly poor quality with regard to resolution, focus, and lighting. Although a few photos clearly depict the children with visible scrapes or contusions, it is difficult to discern any clear injury in many of the photos.

In addition to alleging physical abuse of the children by Mr. Warren, Ms. Ryan also testified that Mr. Warren was neglectful. Her primary evidence on this point concerned an incident during which Mr. Warren had sole oversight of the children during a visit to a zoo (or possibly Sea World). Ms. Ryan testified that Mr. Warren told her that L had wandered off, and that Mr. Warren "ran off leaving [A] there as well to go back in the direction that he thought [L]

---

[5] Ms. Ryan did describe one instance from 2011 in which Mr. Warren "grabbed [A's] arm and twisted it so badly that it had been injured," requiring medical attention. No further elaboration on the event or the consequences flowing therefrom was given.

10

was," and that L was eventually found by a security guard. She also described situations in which Mr. Warren left the children unattended at a beach and in a car in downtown San Diego.

Ms. Ryan testified that Mr. Warren was physically abusive to her as well. Consonant with the discussion above, instances of alleged abuse directed at a spouse, outside the presence of the children, are generally of little significance in assessing the existence of a grave risk to the children. Thus, the Court will not discuss Ms. Ryan's numerous allegations in great detail. Ms. Ryan's testimony primarily focused on an incident in April 2013, during which Mr. Warren became involved in an altercation with Ms. Ryan over keys to the house, in which Mr. Warren allegedly pushed Ms. Ryan over the tow bar on the car, causing her to hit her head and suffer numerous bruises and cuts. She also described an incident at a shopping mall in which, in the presence of Ms. Ryan's parents, Mr. Warren punched the then-pregnant Ms. Ryan in the stomach, causing her to fall to the floor.

Mr. Warren denied having engaged in physical abuse of the children and denied Ms. Ryan's allegations that he had pushed the children into furniture or kicked them. He acknowledged instances in which the children had suffered cuts or scrapes, but testified that these occurred as a result of the children falling at a park while in the care of a nanny or otherwise resulting from ordinary play. He admitted occasionally spanking the children as a form of discipline, describing it as "a little spank on the bottom and no more than that." He acknowledged the situation in which L wandered off during the visit to Sea World while Mr. Warren was attending to A's shoes, but states that he was able to locate L within about seven minutes at a "family room" in the park. He denied Ms. Ryan's characterizations of the events in which he is alleged to have physically abused her, explaining the shopping mall incident as one in which he reflexively swung his arm back in response to Ms. Ryan pinching him, making

11

contact with her but with little force, and described the incident involving the tow bar of the car as being one where the two "bumped" into each other during the incident, with Ms. Ryan falling down as a result.

The Court finds that Ms. Ryan has failed to carry her burden of proving that Mr. Warren presents a grave risk of harm to the children, particularly insofar as Ms. Ryan is required to make such a showing by "clear and convincing evidence. The vast bulk of the evidence on both sides consisted of each party's oral testimony, and Ms. Ryan's assertions that Mr. Warren did a particular thing and Mr. Warren's denials of having done that thing are, at best, in equipoise. Neither side's version of events was presented with a level of detail or clarity that renders one party's version inherently more credible or inherently less credible than the other's.

In such circumstances, the Court would look to evidence that would corroborate Ms. Ryan's allegations. Most cogent would be non-party witnesses who might have observed the incidents of alleged abuse or their immediate consequences. Ms. Ryan made clear that her parents were present at the shopping mall incident, her father may have witnessed some portion of the tow bar incident, and the family appears to have often used the services of a nanny or *au pair*, yet Ms. Ryan did not call any of these individuals as witnesses. Given Ms. Ryan's allegations of numerous instances in which Mr. Warren physically abused the children to the point of injury, the Court would expect that Ms. Ryan might have lodged complaints about that conduct with police or social services agencies, yet she acknowledged never having made any such complaints. Ms. Ryan's training and employment as a family law attorney leads the Court to expect that she would advise clients on how to deal with abusive spouses and partners on a regular basis, and that such advice would often entail reporting such abuse to governmental agencies, yet she does not appear to have done so herself. Moreover, Ms. Ryan does not appear

to have sought medical treatment for the children as a result of any of the alleged abusive incidents by Mr. Warren, but the record establishes that she quickly sought medical treatment in Colorado for A when she suffered what Ms. Ryan describes as "very, very minor bleeding" (an injury that, the Court observes, occurred while A was in Ms. Ryan's sole custody).

The only corroboration that Ms. Ryan offers are the photographs discussed above. Few clearly indicate any apparent injury, and fewer still reflect the kinds of injuries that would be unlikely to arise from the ordinary travails of play by active children (which is to say, there is no evidence of things like burns, broken bones, bruising consistent with punches or kicks by adults, etc.), or even the types of everyday accidents that occur between adults and children in any household. Even assuming the photos show some of the injuries that Ms. Ryan describes – marks left from disciplinary spankings, or hand prints left on a child's arm after a father roughly handles them – are not necessarily indicative of what might ordinarily be considered physical abuse: many a parent of a squirming, occasionally disobedient five-year old may, on occasion, grab the child by an arm and escort them somewhere else with sufficient force to leave marks on the child for brief period of time. In other words, even the photographs, the sole corroborative evidence Ms. Ryan offers, provide limited support for her contentions.

Finally, the Court has difficulty fully crediting Ms. Ryan's testimony in light of the undisputed evidence that she nevertheless chose to leave Mr. Warren alone with the children on several occasions during the family's late 2014 vacation. Most of the incidents of physical abuse alleged by Ms. Ryan occurred in the months prior to that vacation, and thus, one would assume that by that point, Ms. Ryan would be unwilling to leave Mr. Warren alone with the children under any circumstances. Ms. Ryan testified as much, stating that "I always had live-in *au pairs* or I was with someone else as much as I could be" in order to avoid leaving Mr. Warren alone

with the children. However, Ms. Ryan acknowledged that she purposefully delayed the arrival of a nanny or *au pair* by "a few days" during the vacation, allegedly due to concerns over the inappropriateness of the accommodations for the *au pair* and Mr. Warren, thereby requiring Mr. Warren to take sole responsibility for the children for those days. Such conduct is simply inconsistent with Ms. Ryan's allegations that she had witnessed numerous instances of Mr. Warren being physically abusive to the children in the past year.

The Court need not make express credibility findings that one party was more credible than the other. It is sufficient to observe that Ms. Ryan's burden of proving a grave risk by clear and convincing evidence is a formidable burden for her, and that the evidence she presented fails to rise to that level. Accordingly, the Court finds that Ms. Ryan did not establish grounds to overcome the presumption favoring return of the children.

### D. Remedy

The Court then turns to the question of the appropriate remedy. Article 12 of the Convention provides that "[w]here a child has been wrongfully removed . . . the [court] shall order the return of the child forthwith." Notably, the "return" in question is the return of the child to a place, not to a person: as the Convention's Preamble states, it is designed "to establish procedures to ensure their prompt return to the State of their habitual residence." (Emphasis added). This is consonant with the understanding that the Convention is intended to preserve the rights of the state of the children's habitual residence to decide questions of custody. *See Friedrich*, 78 F.3d at 1063-64; *see also* Convention, Art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue"). Thus, the remedy for a wrongful removal is simply to restore the children to

the jurisdiction of their place of habitual residence, and that jurisdiction shall then decide how to apportion custody among the parents. *Id.*

It is necessary to make this observation because parties often misunderstand the effect of a decision favorable to a petitioning parent. Even Mr. Warren's counsel makes this mistake: he concluded his Opening Statement by requesting that "the Court return the children immediately to their father's physical custody for return to their home in Canberra Australia." (Emphasis added.) Although this Court is compelled to order that the children be returned to Australia promptly, nothing in the Convention or ICARA authorizes the Court to dictate who should exercise custody over the children during their transportation or even upon their arrival. Ms. Ryan very well could, consistent with the order that this Court will enter, accompany the children back to Australia and take up her own residence with them there, continuing to exclude Mr. Warren from access to the children while simultaneously making her case to the appropriate Australian court that Mr. Warren's abuse should preclude him from even partial custody. (And, Mr. Warren can conversely seek an order from an Australian court that he be provided immediate access to the children.) Alternatively, Ms. Ryan could theoretically honor this Court's order by returning the children to Australia and placing them in the custody of her parents, a family friend, or foster care, rather than turning them over to Mr. Warren, at least until Australian authorities weigh in on how custody is to be apportioned. The Court does not encourage such escalation in hostilities, but remarks upon them simply to underscore and emphasize the fact that the Convention addresses only the return of the children to a jurisdiction, not to a particular person.

That observation is particularly cogent here, given Ms. Ryan's concerns about Mr. Warren's alleged abuse and the parties' obvious means. Ms. Ryan clearly possesses the training,

experience, and licensure to obtain work in Australia sufficient to allow her to establish a household there, separate from Mr. Warren, where she might choose to remain with the children while matters of custody are ironed out. This Court will not speculate as to what custodial arrangements are appropriate.

## CONCLUSION

Mr. Warren having established that the children were wrongfully removed from Australia and Ms. Ryan having failed to establish any exception to the terms of the Convention and ICARA requiring their return, the Petition must be granted.

**IT IS THEREFORE ORDERED** that the Petitioner Bradly Reed Warren's Petition for Return of Children (**#1**) is **GRANTED**. Ms. Ryan shall make travel arrangements to ensure that that A and L are returned to Canberra, Australia on or before June 15, 2015.

Dated this 5th day of June, 2015.

**BY THE COURT:**

*/s/ Marcia S. Krieger*
_____

Marcia S. Krieger
Chief United States District Judge